UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------x
JEROME BEARD, :
Plaintiff, :
:
v. :
:
INTERNATIONAL BUSINESS :
MACHINES CORPORATION, :
Defendant. :
---------------------------------------------------x

**OPINION AND ORDER**

24 CV 6765 (VB)

Briccetti, J.:

Plaintiff Jerome Beard brings this action against his former employer, International Business Machines Corporation ("IBM"), asserting claims for retaliation in violation of (i) Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a) ("Title VII"), (ii) 42 U.S.C. § 1981, and (iii) the Florida Civil Rights Act, Fla. Stat. § 760.10(7) ("FCRA").

Now pending is defendant's motion for summary judgment. (Doc. #60).

For the reasons set forth below, the motion is GRANTED.

The Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

## BACKGROUND

The parties have submitted briefs, declarations with exhibits, and statements of material facts pursuant to Local Civil Rule 56.1. These submissions reflect the following factual background.

### I. Plaintiff's Employment at IBM

Plaintiff is African-American. He began working for IBM in 1983. For the last fifteen years of his employment, until he was terminated in 2023, plaintiff sold IBM software or infrastructure to customers to imbed into their own products. Plaintiff had a sales quota based on the accounts assigned to his territory.

Starting in 2019, plaintiff's manager was Greg Mount. Mount in turn was managed by Dave Mitchell, and Mitchell was managed by Natalia De Greiff. Mount believed plaintiff was one of his "key" salespeople. (Doc. #71 at ¶ 122). Mitchell similarly believed plaintiff was a very good seller, one of the more creative members of his team, and very passionate about the business. (Doc. #67 at ¶ 16). Mitchell testified plaintiff was the kind of salesperson he wanted to keep around. (Doc. #68-40 at Tr. 36).

II. Plaintiff's Prior Lawsuit and the Kingston Trial

In a lawsuit filed in November 2018, plaintiff alleged IBM racially discriminated against him by paying a similarly situated white salesperson different commissions than it paid plaintiff. Plaintiff and IBM settled that lawsuit in May 2020.

In 2019, plaintiff's former manager, Scott Kingston, filed a lawsuit against IBM, alleging Kingston was fired for protesting IBM's discriminatory decision not to pay plaintiff commissions Kingston felt plaintiff was owed. Kingston's case proceeded to trial in April 2021 (the "Kingston Trial").

Plaintiff testified at the Kingston Trial. Other IBM employees also testified at the Kingston Trial, including Mitchell, who was at the time Kingston's supervisor, and Karla Johnson, who was in charge of enforcing rules related to account changes at IBM.

The jury ultimately found in Kingston's favor, and following appeal, IBM satisfied the judgment stemming from the Kingston Trial on March 3, 2023.

III. The Oracle-Cerner Deal

In January 2021, there were significant organizational changes at IBM that impacted the entire North America sales organization. One of the clients in plaintiff's territory, both before and after this reorganization, was Oracle Corporation. In June 2022, Oracle acquired another

IBM client, Cerner Corporation. Cerner was not in plaintiff's territory. (Doc. #67 at ¶ 41). Rather, Cerner was in the territory of the "Public Market Team," which was the team at IBM that covered large public sector client relationships and healthcare/life sciences accounts. (Id. at ¶ 42).

IBM has a process for moving client accounts between sales teams when one IBM client acquires another. Each year, there is a deadline for submitting account changes for the following year. Account changes are not permitted in the middle of the year. Karla Johnson was in charge of enforcing the rule prohibiting account changes after the deadline.

After Oracle acquired Cerner, Johnson received a request to move the Cerner account under the Oracle account. However, this request was not made until after the September 2022 deadline for submitting account changes for 2023. (Doc. #67 at ¶ 52). Accordingly, Johnson denied the request, and the Cerner account—as well as the sales quota associated with that account—stayed with the Public Market Team for 2023. (Id. at ¶¶ 54, 58). Because the Cerner account was not moved into plaintiff's territory, plaintiff did not carry any sales quota for Cerner in 2023—despite Oracle's acquisition of Cerner. (Id. at ¶ 57). Johnson testified that, at the time she enforced this rule, she did not know her decision would impact plaintiff, or that Oracle was in plaintiff's territory. (Doc. #62 at ¶ 17).

Since the early 2000s, Cerner had an ongoing contract with IBM which was renewed every year or two. (Doc. #67 at ¶¶ 59–60). This contract was renewed in September 2023 (the "Oracle-Cerner Deal"). (Id. at ¶ 64).

De Greiff, who supervised plaintiff's team, and Frank Attaie, who led the Public Market Team, were responsible for deciding which team was going to get credit for the Oracle-Cerner Deal. (Doc. #67 at ¶ 65).

Dave Mitchell testified he tried to get Attaie and De Greiff to split the credit for the Oracle-Cerner Deal between plaintiff's team and the Public Market Team. (Doc. #65-5 at Tr. 221–24). According to Attaie, Mitchell "was advocating really hard for his team" to get credit and payment for the Oracle-Cerner Deal. (Doc. #65-9 at Tr. 130). However, Johnson said it was not possible to split credit in this manner. (Docs. ##65-5 at Tr. 254–55; 65-6 at Tr. 130). Johnson testified that, at the time she told Attaie and De Greiff the revenue for the Oracle-Cerner Deal could not be split, she did not know her input would impact plaintiff or that plaintiff was even covering Oracle or Cerner. (Doc. #62 at ¶¶ 17–20).

Attaie and De Greiff ultimately decided in September 2023 that the Public Market Team would get credit for the Oracle-Cerner Deal (the "Oracle-Cerner Deal Booking"). (Doc. #67 at ¶¶ 65, 70). According to Attaie and De Greiff, they reached this decision because the Public Market Team held the quota for Cerner in 2023. (Docs. ##68-37 at Tr. 131; 68-42 at Tr. 124–25, 128).

Although plaintiff's team did not receive credit for the Oracle-Cerner Deal, Attaie and De Greiff decided to pay plaintiff a $25,000 "essential skills bonus" for his work on the deal. The essential skills bonus is used to provide compensation to individuals for work on deals that are not in their territory. Plaintiff was the only seller at IBM paid an essential skills bonus on the Oracle-Cerner Deal. Attaie and De Greiff also decided the Public Market Team would continue to carry the quota for Cerner in 2024 to avoid burdening plaintiff's team with a quota it would be unlikely to meet.

According to plaintiff, during a phone call on September 30, 2023, regarding the Oracle-Cerner Deal, another IBM employee, Sherry Heath, said her job was "to make sure the right people get paid and we're going to book this thing under Cerner." (Doc. #68-39 at Tr. 110).

Plaintiff believed Heath thought the "right people" were the Cerner team and not plaintiff's team. (Id. at Tr. 112). Later the same evening, Heath emailed management saying, "[m]y apologies I did not catch all of the names on the call," which plaintiff believes was a reference to himself. (Doc. #68-36).

IV. Plaintiff's Placement on a PIP and Termination

In 2023, IBM leadership required that all sellers who were below 70% of their "Target Incentive,"[1] or "TI," in the second half of 2022, and were below 35% of their full year TI in the first half of 2023, be placed on a performance improvement plan ("PIP").

Plaintiff was below 70% of his TI in the second half of 2022, and was below 35% of his full year TI in the first half of 2023. Accordingly, he was placed on a PIP in September 2023. The PIP required plaintiff to reach 70% of his full-year TI by October 31, 2023. This requirement was consistent with the directive that applied to all of North America sales. Others on Mitchell's team were also placed on PIPs.

Mount believed the metrics used to determine which employees would be placed on PIPs did not make sense. (Doc. #68-41 at Tr. 174–76). Mount also believed plaintiff's client base was difficult to evaluate year-to-year. (Doc. #68-4).

On October 25, 2023—shortly before plaintiff's PIP was set to expire—plaintiff emailed Mitchell asking if he could be released from his PIP based on his contribution to the Oracle-Cerner Deal. In response, Mitchell explained that IBM's decision to give credit for the Oracle-Cerner Deal to the Public Market Team was "100% clear," so plaintiff would not "get any relief" for the deal. Mitchell also reminded plaintiff his support on the deal had been rewarded by

[1] An employee's "Target Incentive" is the portion of their pay that was tied to sales performance as compared to their quota. (Doc. #67 at ¶ 7).

paying him the essential skills bonus. Mitchell added, "I appreciate you may not like this answer, but this is it." Mitchell also shared that he was working on securing an exception to extend plaintiff's PIP through December 31, 2023. (Doc. #68-19).

Mitchell did secure an exception to extend plaintiff's PIP through the end of 2023. Other members of Mitchell's team who were on PIPs did not receive exceptions past the October 31 deadline.

Plaintiff ultimately did not meet the requirements of his PIP.

After the conclusion of PIPs, managers such as Mitchell have the opportunity to seek exceptions for individuals who did not meet their PIP goals to keep them employed. Mitchell testified that, for PIPs ending in December 2023, this exception process took place in late January or early February 2024. (Doc. #65-5 at Tr. 48–49). And Mount structured plaintiff's PIP specifically so that it would be scored after late January 2024, to give plaintiff's managers more time to see whether they could make an exception for plaintiff. (Doc. #67 at ¶ 95).

In December 2023, plaintiff requested that IBM start the separation process early rather than wait until 2024 for his PIP to be scored. (Doc. #67 at ¶ 99). Plaintiff maintains he made this request because he believed his termination was "inevitable" at that time. (Id.). Plaintiff also testified he did not want to wait until 2024 because he had a consulting opportunity he did not want to miss out on. (Doc. #68-39 at Tr. 154–55).

Plaintiff's last day of employment at IBM was December 31, 2023.

Mitchell testified he did not seek a PIP exception for plaintiff because plaintiff left IBM before the PIP exception process took place in 2024. (Doc. #63 at ¶ 20). Mitchell also testified he otherwise would have sought an exception for plaintiff, and he believed there was a strong case to secure an exception. (Id. at ¶ 21).

Other members of Mitchell's team were also separated from IBM for failing to meet their PIP requirements. (Doc. #67 at ¶ 105). However, two members of Mitchell's team—Joanna Scheid and Kelsey Campbell—who failed to meet their PIP requirements were given exceptions by Mitchell in early 2024. (Docs. ##63 at ¶ 17; 71 at ¶¶ 200–01).

## DISCUSSION

### I. Standard of Review

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp v. Catrett, 477 U.S. 317, 322 (1986).[2]

A fact is material when it "might affect the outcome of the suit under governing law . . . . Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248. The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir. 2010). It is the moving party's burden to establish the absence of any genuine issue of material fact. Zalaski v. Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party fails to make a sufficient showing on an essential element of its case on which it has the burden of proof, then summary judgment is appropriate. Celotex Corp.

---

[2] Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

v. Catrett, 477 U.S. at 323. If the non-moving party submits "merely colorable" evidence, summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. at 249–50. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts and may not rely on conclusory allegations or unsubstantiated speculation." Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011). "[T]he mere existence of a scintilla of evidence" supporting the non-moving party's position is likewise insufficient; there must be evidence on which the jury could reasonably find for it. Dawson v. Cnty. of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court construes all facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party. Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003). If there is any evidence from which a reasonable inference could be drawn in the non-movant's favor, on the issue on which summary judgment is sought, summary judgment is improper. Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82–83 (2d Cir. 2004).

## II. Analysis

Plaintiff claims IBM retaliated against him for his prior lawsuit in 2018 and for his testimony in the Kingston Trial in April 2021. Plaintiff's retaliation claims are premised on two distinct adverse employment actions: (i) the Oracle-Center Deal Booking, and (ii) his termination. (Doc. #66 at 16).

### A. Legal Standard

Plaintiff's retaliation claims under Title VII, Section 1981, and the FCRA are all governed by the familiar burden-shifting framework set forth in McDonnell Douglas Corp. v.

Green, 411 U.S. 792 (1973). See Littlejohn v. City of New York, 795 F.3d 297, 315 (2d Cir. 2015); Drago v. Jenne, 453 F.3d 1301, 1307 (11th Cir. 2006).

First, plaintiff bears the burden of making out a prima facie case of retaliation. Littlejohn v. City of New York, 795 F.3d at 315–16. To do so, plaintiff must show (i) he engaged in a protected activity, (ii) defendant knew of the protected activity, (iii) he suffered an adverse employment action, and (iv) there was a causal connection between the protected activity and the adverse employment action. Id. Plaintiff's burden in demonstrating a prima facie case is "de minimis." Woodman v. WWOR-TV, Inc., 411 F.3d 69, 76 (2d Cir. 2005).

If plaintiff makes out a prima facie case of retaliation, the burden shifts back to defendant to articulate a legitimate, nonretaliatory reason for its actions. Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005). If defendant does so, plaintiff must then show that defendant's proffered reason was a pretext for retaliation. Id.

B. Retaliation Claims Based on the 2021 Account and Territory Changes

Defendant first argues it is entitled to summary judgment on plaintiff's retaliation claims based on the account and territory changes in 2021. (Doc. #61 at 13–17). Plaintiff offers no response as to these arguments because, according to plaintiff, he advances claims based only on (i) the Oracle-Cerner Deal Booking, and (ii) his termination. (Doc. #66 at 16).

A party's claim is deemed abandoned when it fails to address arguments in opposition papers on a summary judgment motion. Senno v. Elmsford Union Free Sch. Dist., 812 F. Supp. 2d 454, 468 (S.D.N.Y. 2011). Accordingly, to the extent plaintiff ever advanced retaliation claims based on the 2021 account and territory changes, those claims are dismissed. Indeed, even if plaintiff had not abandoned those claims, the Court finds no evidence from which a reasonable jury could find defendant's proffered explanation for the 2021 account and territory

changes—namely, that the changes were part of a reorganization that took place across the entire North America sales organization and were entirely unrelated to plaintiff's 2018 lawsuit and his 2021 testimony in the Kingston Trial—was pretextual. (Doc. #61 at 16).

C. Retaliation Claims Based on the Oracle-Cerner Deal Booking

Defendant next argues it is entitled to summary judgment on plaintiff's claims based on the Oracle-Cerner Deal Booking.[3]

The Court agrees.

1. Prima Facie Case

Defendant challenges only the second and fourth elements of plaintiff's prima facie case of retaliation. In short, defendant argues plaintiff has not shown it had knowledge of plaintiff's protected activity, and in any event, plaintiff cannot show a causal connection between that protected activity and the Oracle-Cerner Deal Booking.

i. Knowledge

With respect to the second element of plaintiff's prima facie case, the Second Circuit has established that plaintiff need only show "general corporate knowledge" of his protected activity.

---

[3] Defendant argues plaintiff cannot show either of two decisions related to the Oracle-Cerner Deal were retaliatory: (i) Johnson's decision not to move the Cerner account under the Oracle account in late 2022, and (ii) Attaie and De Greiff's decision to give the Public Market Team credit for the Oracle-Cerner Deal. (Doc. #61 at 18). However, plaintiff does not argue that Johnson's decision not to move the Cerner account under the Oracle account in late 2022 was retaliatory. (See generally Doc. #66). Accordingly, to the extent plaintiff ever advanced retaliation claims based on Johnson's decision not to move the Cerner account under the Oracle account, those claims have been abandoned and are dismissed. Senno v. Elmsford Union Free Sch. Dist., 812 F. Supp. 2d at 468. The Court considers only plaintiff's claims based on Attaie and De Greiff's decision to give the Public Market Team credit for the Oracle-Cerner Deal.

Gordon v. N.Y.C. Bd. of Educ., 232 F.3d 111, 116 (2d Cir. 2000); Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 844 (2d Cir. 2013).[4]

It bears repeating that plaintiff engaged in two protected activities: (i) his prior lawsuit against IBM in 2018, and (ii) his testimony at the Kingston Trial in 2021. (Doc. #66 at 16). Plaintiff argues he has shown general corporate knowledge of his protected activity because both Mitchell and Johnson knew about both his prior lawsuit and his testimony in the Kingston Trial.

There remains a genuine dispute of material fact as to whether Mitchell or Johnson had knowledge of plaintiff's testimony at the Kingston Trial. To be sure, plaintiff, Mitchell, and Johnson all testified at the Kingston Trial. But Mitchell testified unambiguously he did not know plaintiff testified at the Kingston Trial and otherwise had no knowledge of the substance of plaintiff's testimony. (Docs. #65-5 at Tr. 66, 73). And although Johnson was initially unsure whether she knew plaintiff testified at the Kingston Trial, she ultimately testified she had no knowledge of the substance of plaintiff's testimony. (Doc. #65-7 at Tr. 50–51, 55).

In any event, plaintiff has identified evidence that both Mitchell and Johnson knew about plaintiff's other protected activity—his 2018 lawsuit against IBM. Indeed, both Mitchell and Johnson were deposed in that lawsuit. (Docs. ##68-12; 68-24). This is sufficient to satisfy plaintiff's burden at this stage. See Zann Kwan v. Andalex Grp. LLC, 737 F.3d at 844.

---

4 Defendant argues at length that plaintiff cannot satisfy the second element of his prima facie case of retaliation because the relevant decisionmakers lacked knowledge of plaintiff's protected activity. However, as noted above, the Second Circuit does not require plaintiff to show anything more than general corporate knowledge of his protected activity at this step. Defendant's arguments are more properly aimed at the causation element of plaintiff's prima facie case, and the Court considers them only in that context. See Henry v. Wyeth Pharm., Inc., 616 F.3d 134, 147 (2d Cir. 2010).

ii. Causation

With respect to the fourth element of plaintiff's prima facie case, causation can be established "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus against the plaintiff by the defendant." Gordon v. N.Y.C. Bd. of Educ., 232 F.3d at 117. Moreover, plaintiff must present evidence "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 360 (2013). Thus, plaintiff's retaliation claims "require proof that the desire to retaliate was the but-for cause of the challenged employment action." Lively v. WAFRA Inv. Advisory Grp., Inc., 6 F.4th 293, 304 (2d Cir. 2021).

Here, even construing all facts, resolving all ambiguities, and drawing all permissible inferences in plaintiff's favor, plaintiff has offered no evidence from which a reasonable jury could infer a causal connection between his protected activity and the Oracle-Cerner Deal Booking.

First, the time period between plaintiff's protected activities and the Oracle-Cerner Deal Booking is far too attenuated to establish a causal relationship. Generally, courts in this Circuit require the passage of no more than two months between protected activity and an adverse employment action to support an inference of retaliatory causation. See Smith v. N.Y. & Presbyterian Hosp., 440 F. Supp. 3d 303, 343 (S.D.N.Y. 2020) (collecting cases).

Here, the Oracle-Cerner Deal Booking took place in September 2023, more than two years after plaintiff testified in the Kingston Trial in April 2021, and several years after plaintiff's 2018 lawsuit. In both instances, the temporal gap of more than a year undercuts any inference of

causation. See Burkybile v. Bd. of Educ. of Hastings-On-Hudson Union Free Sch. Dist., 411 F.3d 306, 314 (2d Cir. 2005).[5]

Further, plaintiff has offered no evidence that the relevant decisionmakers had knowledge of his protected activity. It is well established that "absent any evidence to support an inference that the decisionmakers knew of plaintiff's [protected activity], plaintiff cannot rely on circumstantial evidence of knowledge as evidence of causation." Murray v. Visting Nurse Servs. of N.Y., 528 F. Supp. 2d 257, 271 (S.D.N.Y. 2007) (collecting cases).

Here, it is undisputed that Attaie and De Greiff were the ultimate decisionmakers as to how the Oracle-Cerner Deal would be booked. (Doc. #67 at ¶ 65). And both Attaie and De Greiff testified they had no knowledge of plaintiff's prior lawsuit or of his testimony in the Kingston Trial. (Docs. ##65-6 at Tr. 67–68, 70–71; 65-9 at Tr. 23, 132–33).[6]

Nevertheless, plaintiff argues that, pursuant to a theory of "cat's paw" liability, the retaliatory animus of Mitchell and Johnson can be attributed to Attaie and De Greiff. Under the theory of cat's paw liability, "a Title VII plaintiff is entitled to succeed, even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to

---

[5] Plaintiff seeks to avoid this result by arguing the Court should measure temporal proximity not from April 2021—when plaintiff testified in the Kingston Trial—but instead from March 3, 2023—when IBM paid the judgment stemming from the Kingston Trial. This argument is plainly meritless. The date on which IBM paid the judgment stemming from the Kingston Trial is not a date on which plaintiff engaged in protected activity and is thus irrelevant to the temporal proximity analysis. See Altieri v. Albany Pub. Library, 172 F. App'x 331, 334 (2d Cir. 2006).

[6] Plaintiff argues Attaie and De Greiff "may" have known about his protected activity because another IBM executive, Brian Mulada, testified he was often forwarded newspaper articles about "commission-related" lawsuits against IBM and was otherwise made aware of those lawsuits by lawyers. (Doc. #67 at ¶¶ 116–20) But Mulada's testimony about his own personal knowledge of lawsuits does not create a genuine dispute of fact with respect to Attaie or De Greiff's knowledge of plaintiff's protected activity—especially given Attaie and De Greiff's unequivocal testimony that they had no such knowledge.

have the impermissible bias played a meaningful role in the decisionmaking process." Vasquez v. Empress Ambulance Serv., Inc., 835 F.3d 267, 272 (2d Cir. 2016).

Plaintiff's cat's paw theory fails because, even assuming Mitchell and Johnson played a meaningful role in the Oracle-Cerner Deal Booking, plaintiff has not introduced evidence from which a reasonable jury could find either Mitchell or Johnson acted with retaliatory animus. See Campo v. City of New York, 2022 WL 970730, at *8 (E.D.N.Y. Mar. 31, 2022) ("In order for Plaintiff to establish her cat's paw retaliation claim, she must first establish that the biased subordinate . . . acted with retaliatory animus.").

Plaintiff argues Mitchell and Johnson were motivated by retaliatory animus because of the "immense strain" plaintiff's "participation in litigation forced on them." (Docs. ##66 at 30; 71 at ¶¶ 137–38). But plaintiff's argument finds no support in the record. At most, Mitchell testified he was "surprised" the Kingston Trial jury did not agree with his testimony in that case and would be "upset" to think the jury believed he had been dishonest under oath. (Doc. #68-40 at Tr. 29–30). Similarly, Johnson said she found testifying in the Kingston Trial to be "stressful" and generally does not enjoy sitting for depositions. (Doc. #68-38 at Tr. 27, 39–40). This testimony simply does not support plaintiff's claim that his participation in litigation posed "an extremely difficult experience for both Mitchell and Johnson." (Doc. #71 at ¶ 138).

And the record is otherwise incompatible with a finding that Mitchell or Johnson acted with retaliatory animus during the Oracle-Cerner Deal Booking. To the contrary, the record shows Mitchell held plaintiff in high regard and sought to influence Attaie and De Greiff in plaintiff's favor. (Doc. #65-5 at Tr. 32, 221–24). Plaintiff himself recognized Mitchell "fought, advocated, debated, and argued" for plaintiff to receive credit for the Oracle-Cerner Deal. (Doc. #68-39 at Tr. 161). That Mitchell ultimately "acquiesced," could have done more, or was

otherwise unsuccessful in convincing Attaie and De Greiff does not support a finding of retaliatory animus. (Id.).

Similarly, Johnson's unrefuted testimony is that, at the time she told Attaie and De Greiff the revenue for the Oracle-Cerner Deal could not be split between teams, she did not know her input would impact plaintiff whatsoever or that plaintiff was even covering Oracle or Cerner.[7] (Doc. #62 at ¶¶ 17–20).

In short, because plaintiff has failed to establish retaliatory animus on the part of Mitchell or Johnson, there is no animus to impute to Attaie or De Greiff. Thus, the actual decisionmakers' lack of knowledge of plaintiff's protected activity is compelling evidence showing a lack of a causal connection. See Gordon v. N.Y.C. Bd. of Educ., 232 F.3d at 117.

Finally, the only "direct" evidence of retaliatory animus plaintiff purports to offer in the context of the Oracle-Cerner Deal Booking is Heath's comment that her job was "to make sure the right people get paid." (Docs. ##66 at 23; 68-39 at Tr. 109–110).[8] Plaintiff also highlights that, later the same night, Heath emailed management saying, "[m]y apologies I did not catch all of the names on the call," which plaintiff believes was a reference to himself. (Doc. #68-36).

---

[7] Plaintiff attempts to refute this testimony on the ground that Johnson could readily have found out plaintiff was involved in the Oracle-Cerner Deal. (Doc. #67 at ¶ 111). But the fact that Johnson could have discovered plaintiff's involvement does not refute her unambiguous testimony that she did not know plaintiff was involved.

[8] Plaintiff also argues a jury could infer causation from the fact that the Oracle-Cerner Deal Booking was contrary to IBM's own policies. (Doc. #66 at 23). "Although violation of an organization's internal procedures alone is insufficient to create an inference of discrimination or retaliation, failure to follow internal procedures can be evidence of pretext." See Bagley v. J.P. Morgan Chase & Co., 2012 WL 2866266, at *15 (S.D.N.Y. July 12, 2012) (collecting cases). Accordingly, the Court considers this argument only at step three of the McDonnell Douglas framework.

However, even viewing the record in the light most favorable to plaintiff, Heath's comments do not suggest a desire to retaliate against plaintiff for his protected activity. Heath's comments, even if misplaced or rude, show only that she was the individual tasked with booking the Oracle-Cerner Deal in the manner Attaie and De Greiff prescribed. (Doc. #68-41 at Tr. 211–14, 248). Indeed, plaintiff has not argued or introduced evidence that Heath was a decisionmaker, or even a biased subordinate whose retaliatory animus could be imputed to the decisionmakers. Therefore, the Court finds Health's comments, which did not "refer[] to—let alone condemn[]"—plaintiff's protected activity, do not support an inference of retaliatory intent. See Lebowitz v. N.Y.C. Dep't of Educ., 407 F. Supp. 3d 158, 177–78 (S.D.N.Y. 2017).

Simply put, plaintiff has produced no evidence from which a reasonable jury could conclude his protected activity was the but-for cause of the Oracle-Cerner Deal Booking. Plaintiff has thus failed as a matter of law to make out a prima facie case of retaliation.

2. Legitimate Nonretaliatory Reason

Assuming plaintiff met his de minimis burden of making out a prima facie case—which he did not—defendant has met its burden of proffering a legitimate, nonretaliatory reason for the Oracle-Cerner Deal Booking. Specifically, defendant maintains Attaie and De Greiff determined, in accordance with IBM's standard practice, the Public Market Team would receive revenue credit because it carried the quota for Cerner, which was in its territory, and because the Oracle-Cerner Deal was a renewal of a longstanding contract between Cerner and IBM. This suffices to meet defendant's burden at step two of the McDonnell Douglas burden shifting framework. See Marinacci v. U.S. Postal Serv., 403 F. Supp. 3d 116, 127 (E.D.N.Y. 2017).

3. Pretext

Defendant further argues that plaintiff has produced no evidence giving rise to an inference that the proffered legitimate, nonretaliatory reason for the Oracle-Cerner Deal Booking was pretextual.

The Court agrees.

Plaintiff can show pretext by "demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." Zann Kwan v. Andalex Grp. LLC, 737 F.3d at 846.

An employer's failure to follow internal procedures can be evidence of pretext. See Bagley v. J.P. Morgan Chase & Co., 2012 WL 2866266, at *15 (S.D.N.Y. July 12, 2012) (collecting cases). Nonetheless, "summary judgment is appropriate where whatever irregularities existed were either unrelated to [retaliation] or did not affect the final adverse decision." Hiramoto v. Goddard Coll. Corp., 684 F. App'x 48, 50 (2d Cir. 2017).

Here, plaintiff argues a jury could infer pretext from the fact that "IBM blatantly violated its own rule—that quotas are set at the account level and not the deal level[9]—in processing the [Oracle-Cerner] deal." (Doc. #66 at 23, 29). According to plaintiff, because Oracle signed the Oracle-Cerner Deal contract, and Oracle was plaintiff's account, IBM's rules would hold that plaintiff's team—not the Public Market Team—carried the quota for the Oracle-Cerner Deal, and his team should have been credited accordingly. (See Docs. ##67 at ¶ 38; 71 at ¶ 172)

Even assuming IBM deviated from one of its rules, plaintiff has not offered any evidence connecting defendant's deviation to any retaliatory motive. Samuels v. Urb. Assembly Charter

[9] IBM disputes that this is in fact the "rule." (Doc. #69 at 11). The Court finds Johnson's testimony that quotas are set at the account level is sufficient to show this is IBM's standard policy. (Doc. #68-38 at Tr. 107).

Sch. For Comput. Sci., 2025 WL 1785847, at *8 (S.D.N.Y. June 26, 2025) ("[A]bsent other evidence of retaliatory animus, procedural irregularities alone are generally insufficient to establish pretext."). To the contrary, the record shows that the reason for the deviation was that Attaie and De Greiff—who had no knowledge of plaintiff's protected activity—wanted to credit the Public Market Team, which had a longstanding contract with Cerner, still held the quota for Cerner in 2023, and would have otherwise been unable to satisfy that quota. (Docs. ##68-17; 68-37 at Tr. 131; 68-42 at Tr. 124, 128). Indeed, plaintiff does not dispute that the Public Market Team carried the quota for Cerner in 2023 because, in accordance with IBM's account change policy, the Public Market Team's late request to move the Cerner account under the Oracle account was denied. (Doc. #67 at ¶¶ at 52–54).

In other words, the record shows the reason for the deviation, if any, is the same as defendant's proffered legitimate, nonretaliatory reason for the Oracle-Cerner Deal Booking. And the record in no way suggests the reason for the deviation was unlawful retaliation. There is no evidence that plaintiff's protected activity was discussed during the decision-making process. (Doc. #68-17). The only discussion of plaintiff was to ensure he would receive the $25,000 essential skills bonus for his contribution to the deal and would not be burdened with Cerner's quota in 2024. (Id.).

At bottom, plaintiff has produced no evidence from which a reasonable jury could conclude defendant's proffered legitimate, nonretaliatory reason for the Oracle-Cerner Deal Booking was a pretext for retaliation. Accordingly, even if plaintiff made out a prima facie case of retaliation, defendant would nevertheless be entitled to summary judgment.

D. Retaliation Claims Based on Termination

Finally, defendant argues it is entitled to summary judgment on plaintiff's claims based on his termination.

The Court agrees.

1. Prima Facie Case

Defendant again challenges only the second and fourth elements of plaintiff's prima facie case of retaliation.[10]

i. Knowledge

For the same reasons detailed above, plaintiff has satisfied his burden of showing defendant had "general corporate knowledge" of his protected activity. Specifically, plaintiff has introduced evidence that both Mitchell and Johnson knew about his prior lawsuit against IBM in 2018. (Docs. ##68-12; 68-24).

ii. Causation

Here, plaintiff has offered no evidence from which a reasonable jury could infer a causal connection between his protected activity and his termination.

With respect to temporal proximity, plaintiff's termination occurred in December 2023, more than two years after plaintiff's testimony at the Kingston Trial in 2021, and several years after plaintiff's prior lawsuit in 2018. Again, this substantial temporal gap undercuts any

---

[10] Plaintiff belabors whether his separation from IBM was an involuntary termination or a voluntary resignation. There is no genuine dispute of material fact on this issue. Defendant does not dispute that plaintiff was terminated for failure to meet his PIP requirements. (Doc. #61 at 26). And it is undisputed that plaintiff's termination took place in December 2023, rather than February or March 2024, because plaintiff requested early separation. (Doc. #67 at ¶¶ 94, 99). The semantics the parties use to describe these events are irrelevant. Indeed, defendant does not, for example, argue plaintiff did not suffer an adverse employment action because he voluntarily resigned.

inference of causation. See Burkybile v. Bd. of Educ. of Hastings-On-Hudson Union Free Sch. Dist., 411 F.3d at 314.[11]

As direct evidence of retaliatory intent, plaintiff relies on Greg Mount's testimony that plaintiff was "one of [the] best guys" on Mount's team, and that Mount was "sick to [his] stomach" about plaintiff's separation. (Doc. #68-41 at Tr. 33–34). Plaintiff also highlights that Mount disagreed with the metrics IBM leadership used in deciding which employees to place on PIPs. (Id. at Tr. 174–76). But plaintiff does not explain how Mount's disagreement with plaintiff's termination provides direct—or even indirect—evidence of defendant's retaliatory animus. See Abdullah v. Skandinaviska Enskilda Banken Corp., 1999 WL 945238, at *6 (S.D.N.Y. Oct. 19, 1999) ("Such a difference of opinion provides no evidence of either pretext or discriminatory motivation.").

Further, as defendant highlights, there is no evidence the relevant decisionmaker with respect to plaintiff's termination—Dave Mitchell—harbored retaliatory animus against plaintiff. First, it is undisputed Mitchell secured an exception to extend plaintiff's PIP, which was originally set to expire in October 2023, until December 31, 2023. (Doc. #67 at ¶ 87). It is also undisputed Mitchell tried to put together a deal in the fourth quarter of 2023 to help plaintiff

---

[11] Plaintiff again advances the meritless argument that the Court should measure temporal proximity using dates other than the dates of his protected activity and termination. (Doc. #66 at 21–22). To the extent plaintiff seeks to measure temporal proximity from events occurring in the Kingston Trial (such as IBM's unsuccessful appeal or satisfaction of the judgment from the Kingston case), as stated above, those dates are irrelevant. See Altieri v. Albany Pub. Library, 172 F. App'x at 334. To the extent plaintiff seeks to measure temporal proximity from his placement on a PIP in September 2023 rather than his termination in December 2023, that argument is also unavailing. Even assuming the date of the PIP was "somewhat relevant to the temporal proximity determination," Ulrich v. Moody's Corp., 2017 WL 1232709, at *14 (S.D.N.Y. Mar. 31, 2017), plaintiff was placed on the PIP in September 2023. As the Court explained with respect to the Oracle-Cerner Deal Booking (which also occurred in September 2023), a gap of more than two years from plaintiff's latest protected activity undercuts any inference of retaliation.

meet his PIP. (Id. at ¶ 110). Plaintiff himself testified he believed Mitchell's "heart was in the right place," and plaintiff "appreciate[d] what [Mitchell] did" for him. (Doc. #68-39 at Tr. 142–43).

Thus, the Court finds plaintiff has failed to offer evidence from which a reasonable jury could conclude his protected activity was the but-for cause of his termination. Accordingly, plaintiff has failed as a matter of law to make out a prima facie case of retaliation.

2. Legitimate Nonretaliatory Reason

Assuming plaintiff met his de minimis burden of making out a prima facie case—which he again did not—defendant has met its burden of proffering a legitimate, nonretaliatory reason for plaintiff's termination. Specifically, defendant maintains plaintiff was terminated because he failed to meet the requirements of his PIP. (Doc. #67 at ¶ 84). This suffices to meet defendant's burden at step two of the McDonnell Douglas burden shifting framework. See Campbell v. Cellco P'ship, 860 F. Supp. 2d 284, 302 (S.D.N.Y. 2012).

3. Pretext

Defendant further argues that plaintiff has produced no evidence giving rise to an inference that the proffered legitimate, nonretaliatory reason for plaintiff's termination was pretextual.

The Court agrees.

Plaintiff first attempts to show pretext by arguing he "would have easily satisfied the PIP's target" if defendant "did not retaliate against him by refusing to give [him] any revenue credit" for the Oracle-Cerner Deal. (Doc. #66 at 26). However, as explained above, plaintiff has not shown defendant's actions in connection with the Oracle-Cerner Deal were retaliatory.

Plaintiff also briefly argues a jury could infer pretext from the fact that Mitchell gave PIP exceptions to other employees—Joanne Scheid and Kelsey Campbell—while "making it unmistakably clear to [plaintiff] that Mitchell would not do the same for him." (Doc. #66 at 27). To the extent plaintiff aims to show pretext through disparate treatment of similarly situated comparators, his cursory argument is unavailing.

A showing that similarly situated employees received more favorable treatment can serve as evidence of pretext, but only if the plaintiff shows he was "similarly situated in all material respects" to the individuals with whom he seeks to compare himself. Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000).[12] These comparators "must have been subject to the same standards governing performance evaluation and discipline, and have engaged in conduct similar to the plaintiff's without such differentiating or mitigating circumstances that would distinguish their conduct or appropriate discipline for it." Clark v. Jewish Childcare Ass'n, Inc., 96 F. Supp. 3d 237, 256 (S.D.N.Y. 2015).

Here, plaintiff highlights that Scheid and Campell also failed to meet their PIP requirements, but were nevertheless given PIP exceptions by Mitchell. (Doc. #71 at ¶¶ 200–01). However, the information plaintiff has provided is insufficient to create an inference of pretext through comparators.

First, although Scheid failed to meet her PIP requirements in 2023, plaintiff recognizes that this was because Scheid was on a leave of absence in 2023. (Doc. #71 at ¶ 200). There can be no dispute that, at least in this respect, she was not similarly situated to plaintiff.

[12] District courts evaluating disparate treatment theories in retaliation cases have routinely followed Second Circuit case law about disparate treatment theories in discrimination cases. See, e.g., Lee v. Bronx Healthcare Sys., 2026 WL 2199852, at *5–6 (S.D.N.Y. July 30, 2026); Van Allen v. N.Y.C. Sch. Constr. Auth., 2018 WL 4783966, at *10 n.6 (E.D.N.Y. Sep. 30, 2018); Senno v. Elmsford Union Free Sch. Dist., 812 F. Supp. 2d at 474–75.

Plaintiff also cannot overcome the evidence that, unlike Scheid and Campbell, in December 2023 he asked IBM to terminate his employment before the PIP exception process could play out. (Doc. #65-12). Indeed, Mitchell's unrefuted testimony is that he would have sought a similar exception for plaintiff had plaintiff not left before the PIP exception process took place in early 2024. (Doc. #63 at ¶¶ 16–17, 20–21).

Plaintiff maintains he only made this request because he believed his termination was inevitable. (Doc. #67 at ¶ 99). Plaintiff also testified he did not want to wait until 2024 because he had a consulting opportunity on which he did not want to miss out. (Doc. #68-39 at Tr. 154–55). But regardless of plaintiff's reason for requesting early separation, he does not dispute he made that request. (Doc. #67 at ¶ 99). And plaintiff has introduced no evidence suggesting Scheid or Campbell made a similar request. This "differentiating" circumstance plainly distinguishes plaintiff's conduct from that of his comparators. Clark v. Jewish Childcare Ass'n, Inc., 96 F. Supp. 3d at 256.

Finally, plaintiff has not offered any evidence to show Mitchell treated him differently by giving Scheid and Campbell PIP exceptions while "making it unmistakably clear to [plaintiff] that Mitchell would not do the same for him." (Doc. #66 at 27). Plaintiff has introduced no evidence of Mitchell's communications—if any—with Scheid or Campbell regarding their likelihood of getting a PIP exception.

Importantly, the record does not support plaintiff's claim that Mitchell unequivocally refused to give him a PIP exception. The exhibit plaintiff relies on shows only that in October 2023, Mitchell declined plaintiff's request to be released from his PIP based on his contribution to the Oracle-Cerner Deal. (Doc. #68-19). In this same exchange, however, Mitchell told plaintiff he would seek an extension of plaintiff's PIP through December 31, 2023. (Id.). To

plaintiff's benefit, Mitchell ultimately secured that extension. (Doc. #67 at ¶ 87). And plaintiff has introduced no evidence that Mitchell refused to grant him a PIP exception in the normal course of the PIP exception process—like Mitchell did for Scheid and Campbell—nor has plaintiff introduced evidence that Mitchell otherwise told him he would not receive a PIP exception during that process.[13] The Court therefore cannot conclude that Scheid and Campbell may serve as comparators to establish pretext.

To the extent plaintiff argues—regardless of any comparators—that a jury could infer pretext from Mitchell's unfair treatment of him, as explained repeatedly in this opinion, plaintiff has introduced no evidence suggesting Mitchell acted with retaliatory animus or otherwise sought to disadvantage plaintiff.

In short, plaintiff has produced no evidence from which a reasonable jury could conclude defendant's proffered legitimate, nonretaliatory reason for plaintiff's termination was a pretext for retaliation. Thus, even if plaintiff made out a prima facie case of retaliation, defendant would nevertheless be entitled to summary judgment.

---

[13] Plaintiff also relies on Mitchell's deposition testimony that, as of October 2023, it was not "fair to say [plaintiff] should have expected" a PIP exception in January if he missed his PIP goals. (Doc. #68-40 at Tr. 296–97). This deposition testimony does not support plaintiff's argument that Mitchell directly told plaintiff he would not receive a PIP exception.

## CONCLUSION

The motion for summary judgment is GRANTED.

The Clerk is instructed to terminate the motion (Doc. #60) and close this case.

Dated: September 15, 2026
White Plains, NY

SO ORDERED:

Vincent L. Briccetti
United States District Judge